**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

MARIS SANCHEZ, Derivatively on Behalf of Clovis Oncology, Inc.,

      Plaintiff,

v.

BRIAN G. ATWOOD,
M. JAMES BARRETT,
JAMES BLAIR,
KEITH FLAHERTY,
GINGER GRAHAM,
PAUL KLINGENSTEIN,
PATRICK J. MAHAFFY,
EDWARD J. MCKINLEY, and
THORLEF SPICKSCHEN,

      Defendants,

-and-

CLOVIS ONCOLOGY, INC.

      Nominal Defendant

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

**INTRODUCTION**

1.    Plaintiff Maris Sanchez ("Plaintiff"), by and through her attorneys, brings this action derivatively on behalf of nominal defendant Clovis Oncology, Inc. ("Clovis" or the "Company") and allege upon personal knowledge as to herself and her own acts, and as to all other matters based upon the investigation conducted by her attorneys, which include, among other

1

things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly-available information regarding the Company.

2.      This is a shareholder derivative action brought on behalf of the Company against former and current members of its Board of Directors ("Board") and/or certain of its executive officers.  This action seeks to remedy Defendants' (defined below) breaches of fiduciary duties and other violations of the law that occurred from February 27, 2014 through the present (the "Relevant Period").

3.      According to its SEC filings, Clovis is a clinical-stage biopharmaceutical company that focuses on acquiring, developing and commercializing innovative anti-cancer agents in the United States, Europe and additional international markets.  The Company targets its development programs for the treatment of specific subsets of cancer populations and seek to simultaneously develop, with partners, companion diagnostics that direct its product candidates to the patients that are most likely to benefit from their use.  The Company has not yet reported a profit and has incurred losses in each year since its inception in April 2009. For the years ended December 31, 2014, 2013 and 2012, the Company had net losses of $160.0 million, $84.5 million and $74.0 million, respectively. As of December 31, 2014, the Company had an accumulated deficit of $429.0 million.

4.      The Company has relied on its ability to fund its operations through debt and multiple equity financings (selling securities). Management expects operating losses and negative cash flow to continue into the foreseeable future. As the Company continues to incur losses, transition to profitability is dependent upon the successful development, approval and

commercialization of its product candidates and achieving a level of revenues adequate to support the Company's cost structure.

5.     The Company's core drug is Rociletinib, an oral epidermal growth factor receptor and mutant-selective covalent inhibitor that is in advanced clinical development for the treatment of non-small cell lung cancer.

6.     On November 16, 2015, the Company issued a press release announcing that the FDA requested additional clinical data after the efficacy data for the Company's lung cancer drug rociletinib (CO-1686) was questioned.  Specifically, the Company disclosed that the FDA requested additional clinical data for use in the efficacy analysis for both the 500mg and 625mg BID dose patient groups for rociletinib, and that "as the rociletinib clinical trials were rapidly enrolling, Clovis presented interim data publicly and at medical meetings and this data therefore included a data set based primarily on unconfirmed responses.  This was also true of the Company's Breakthrough Therapy designation submission. In the Company's NDA submission, both immature confirmed and unconfirmed response analyses were submitted.  As the efficacy data have matured, the number of patients with an unconfirmed response who converted to a confirmed response was lower than expected."

7.     This revelation caused the Company's stock to plummet, erasing approximately 73% of the Company's value, wiping out approximately $3 billion in its market cap.  Under management's tutelage, the Company has been downgraded from a hold rating to a sell rating by Zacks Investment Research.

8.     Throughout the Relevant Period, Defendants caused the Company to issue materially false and misleading statements and failed to disclose: 1) that the New Drug Application ("NDA") that Clovis submitted to the FDA for Rociletinib contained immature data sets based on

3

both unconfirmed response rates and confirmed response rates; 2) that Clovis' Breakthrough Therapy designation submission contained immature data set based primarily on unconfirmed responses; 3) that Clovis presented interim data publicly and at medical meetings that included a data set based primarily on unconfirmed responses; 4) that as the efficacy data matured, the number of patients with an unconfirmed response who converted to a confirmed response was lower than expected; 5) that as a result of the foregoing, Clovis' NDA was likely to be delayed or rejected by the FDA; and 6) that as a result of the foregoing, statements made about Clovis' operations and future prospects were false and misleading.

9.     The Company remains controlled and under the influence of the primary wrongdoers who have irreparable conflicts and will likely be implicated in the wrongdoing as alleged herein.  According to the Company's SEC filings, the Company's management, directors, and holders of 5% or more of the Company's capital stock and their affiliates owned approximately 40.6% of the Company's voting stock as of December 31, 2014, effectively leaving them in control of the Company with an insurmountable voting bloc.   Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of the Company and for restitution to the Company for, among other things, the costs and expenses that have, and will be paid, by the Company as a result of Defendants' wrongdoing.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and countries and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more Defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) Defendants have received substantial compensation in this district by conducting business herein and by engaging in numerous activities that have had an effect in this district.

## PARTIES

13.     Plaintiff is a current shareholder of the Company and has been a continuous shareholder of the Company.  Plaintiff is a citizen of New York.

14.     Nominal Defendant Clovis is incorporated in the State of Delaware and maintains its principal place of business at 2525 28th Street, Suite 100, Boulder, Colorado.

15.     Defendant Brian Atwood ("Atwood") has served as a director since the Company's inception and served on the Audit Committee during the Relevant Period.   Upon information and belief, Atwood is a citizen and resident of the state of California.

16.     Defendant M. James Barrett ("Barrett") has served as a director since the Company's inception and served on the Compensation Committee during the Relevant Period. Upon information and belief, Barrett is a citizen and resident of the state of Maryland.

5

17.     Defendant James Blair ("Blair") has served as a director since the Company's inception and served on the Compensation Committee during the Relevant Period.     Upon information and belief, Blair is a citizen and resident of the state of California.

18.     Defendant Keith Flaherty ("Flaherty") has served as a director since 2013.   Upon information and belief, Flaherty is a citizen and resident of the state of Massachusetts.

19.     Defendant Ginger Graham ("Graham") has served as a director since 2013 and served on the Compensation Committee during the Relevant Period.  Upon information and belief, Graham is a citizen and resident of the state of Colorado.

20.     Defendant Paul Klingenstein ("Klingenstein") has served as a director since the Company's inception and served on the Audit Committee during the Relevant Period. Upon information and belief, Klingenstein is a citizen and resident of the state of California.

21.     Defendant Patrick J. Mahaffy ("Mahaffy") is one of the Company's co-founders and has served as the Company's President and Chief Executive Officer ("CEO") since the Company's inception. Upon information and belief, Stoll is a citizen and resident of the state of Colorado.

22.     Defendant Edward J. McKinley ("McKinley") has served as a director since the Company's inception and served on the Audit Committee during the Relevant Period. Upon information and belief, McKinley is a citizen and resident of the state of Michigan.

23.     Defendant Thorlef Spickschen ("Spickschen") has served as a director since the Company's inception and served on the Audit Committee during the Relevant Period.  Upon information and belief, Spickschen is a citizen and resident of the country of Germany.

24.     Defendants Atwood, Barrett, Blair, Flaherty, Graham, Klingenstein, Mahaffy, McKinley and Spickschen are collectively referred to herein as the "Defendants" or the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

26.     Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial, and/or directorial positions within the Company, as well as their backgrounds and educations, each of the Individual Defendants had

7

access to adverse, non-public information about the Company's financial condition and operations, and the misrepresentations made relevant thereto.

28.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

29.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.     neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

30.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

31.     The Individual Defendants breached their duties of loyalty and good faith by permitting defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein.  In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

32.     Before a company can market a drug in the United States, it has to obtain FDA approval of the drug and apparatus under a §505(b)(2) New Drug Application ("NDA").

33.     The FDA requires rigorous scientific testing to ensure that a drug is safe and effective for its intended use before the Agency will permit it to be marketed in the United States. Before considering approval of a drug for its indicated use, the Agency requires a "sponsor" to submit a NDA for consideration, which contains data from clinical trials, preclinical studies, and manufacturing information that supports the product's safety and efficacy.

34.     Clinical testing typically involves a three-phase process:

Phase 1 clinical trials are conducted in a small number of volunteers or patients to assess the early tolerability and safety profile of the drug, and the pattern of drug absorption, distribution and metabolism;

Phase 2 clinical trials are conducted in a limited patient population afflicted with a specific disease in order to assess appropriate dosages and dose regimens, expand evidence of the safety profile, and evaluate preliminary efficacy; and

Phase 3 trials are large, controlled clinical trials conducted on patients with a specific disease to generate enough data to statistically evaluate the efficacy and safety of the product for approval, as required by the FDA, to establish the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug.

35.     According to FDA regulations, the FDA must be notified no later than 15 days after learning of a "serious adverse drug experience," which includes any reaction that is fatal, life threatening, or requires in-patient hospitalization or prolongs hospitalization. If it is an "unexpected" reaction, the FDA must be notified by telephone, facsimile transmission, or in writing, within 7 calendar days of the receipt of that information.  A complete written report must follow within 8 calendar days.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

36.     On February 27, 2014, Defendants caused the Company to issue a press release entitled, "Clovis Oncology Announces 2013 Operating Results and Expands CO-1686 Development Program."  The press release stated in relevant part:

- ***CO-1686 Phase 2 expansion cohorts increased in size to approximately 300 patients***
- ***Potential to accelerate NDA submission timeline***

BOULDER, Colo.--(BUSINESS WIRE)--February 27, 2014--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its quarter and year ended December 31, 2013, and provided an update on the expected milestones for its clinical development programs for 2014.

"2013 was obviously a great year for us and it has set the stage for what will be an even more important year for our company," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "We are now aggressively moving forward with our plan to initiate registration studies for CO-1686 in the second quarter. We have also initiated a global Phase 3 registration study for rucaparib and will initiate our Phase 2 lucitanib studies in the next couple of months. This has been a period of rapid progress for our company that we hope will lead to our first New Drug Application (NDA) submission in 2015.

11

"Importantly, we have been delighted to see encouraging activity at each of the CO-1686 hydrobromide salt (HBr) doses, and we are increasing the size of our expansion cohorts to swiftly build a larger clinical data set in our T790M+ cohorts," added Mahaffy. "We are also aware that the FDA has publicly encouraged sponsors to more fully evaluate dose in their development programs prior to NDA submission. We now plan to enroll approximately 150 to 200 patients in two dose cohorts of T790M+ patients directly after progression on first and only TKI therapy, which is comparable to our TIGER2 patient population. We will also enroll approximately 150 patients in two dose cohorts of T790M+ later-line patients directly after progression on their second or later TKI therapy or subsequent chemotherapy, similar to TIGER3. We have a very active and well-tolerated drug and we are going to drive this development program rapidly and thoughtfully. Data from these studies could also serve as the basis for an earlier NDA submission."

### 2013 Financial Results and 2014 Financial Outlook

Clovis reported a net loss of $29.2 million for the fourth quarter of 2013, and $84.5 million for the year ended December 31, 2013. This compares to a net loss of $21.1 million for the fourth quarter and $74.0 million for the year ended December 31, 2012. Net loss attributable to common stockholders for the fourth quarter of 2013 was $0.92 per share, compared to $0.81 per share for the fourth quarter of 2012, and $2.95 per share for the year ended December 31, 2013, compared to $2.97 per share for the year ended December 31, 2012.

Research and development expenses totaled $22.5 million for the fourth quarter of 2013 and $66.5 million for full year 2013, compared to $18.3 million for the fourth quarter of 2012 and $58.9 million for the full year 2012. The increase in research and development expenses over the comparable periods in 2012 was driven by increased development activities for both CO-1686 and rucaparib, partially offset by the wind-down of development activities for CO-101 beginning in late 2012. As expected, research and development expenses for the fourth quarter of 2013 increased over the third quarter of 2013 by $6.5 million due primarily to the initiation of the ARIEL2 and ARIEL3 rucaparib clinical studies and the manufacturing of clinical supplies for both the rucaparib and CO-1686 programs.

General and administrative expenses totaled $5.5 million for the fourth quarter of 2013 and $16.6 million for the full year 2013, compared to $2.8 million for the fourth quarter of 2012 and $10.6 million for the full year 2012. The increase in general and administrative expenses over the comparable periods in 2012 was primarily due to increased stock compensation expense for employees engaged in general and administrative functions and third party costs to support the Company's expanded activities. In addition, general and administrative expenses for 2013 were impacted by transaction costs related to the Company's acquisition of EOS (Ethical Oncology Science) S.p.A., which totaled $1.6 million for the fourth quarter of 2013 and $2.2 million for the full year 2013.

12

Operating expenses for the fourth quarter of 2013 include $2.8 million of stock compensation expense, compared to $1.3 million of stock compensation expense for the fourth quarter of 2012. Operating expenses for the full year 2013 included $9.5 million of stock compensation expense, compared to $4.9 million of stock compensation expense for the comparable period in 2012.

As of December 31, 2013, Clovis had $323.2 million in cash and cash equivalents and 33.9 million outstanding shares of common stock. The Company used $71.7 million to fund operations for the year ended December 31, 2013, and expects a cash burn of approximately $120 million for 2014.

**Progress Toward 2014 Key Milestones and Objectives**

The Company has substantive clinical, regulatory and development objectives for 2014 for each of its key products; descriptions of each product, highlights of recent progress and planned objectives follow.

<u>CO-1686</u>

CO-1686 is a novel, oral, targeted, covalent inhibitor of the mutant forms of the epidermal growth factor receptor (EGFR) in development for the treatment of non-small cell lung cancer (NSCLC). CO-1686 was designed to selectively target both the initial activating EGFR mutations as well as the T790M resistance mutation, while sparing wild-type, or "normal" EGFR.

The Company has seen no evidence of TKI-related EGFR wild-type rash and diarrhea at any dose or formulation studied. The dose-limiting toxicity of hyperglycemia is easily managed and most patients are asymptomatic. CO-1686 is the only EGFR-directed therapy to spare wild-type EGFR in clinical studies, which the Company believes represents a significant point of differentiation from approved EGFR inhibitors and those currently in development.

The Company is currently enrolling two Phase 2 expansion cohorts of its Phase 1/2 study in EGFR mutant patients with the T790M mutation; the first includes approximately 150 to 200 T790M+ patients directly after progression on their first and only TKI therapy, comparable to the population we will seek to enroll in our TIGER2 registration study. The second cohort includes approximately 150 later-line T790M-positive patients directly after progression on their second or later TKI therapy or subsequent chemotherapy, similar to the population we seek to enroll in TIGER3.

Clovis expects to initiate three registration studies in the TIGER (Third-generation Inhibitor of Mutant EGFR in Lung Cancer) program during the first half of 2014. The TIGER2 study, in T790M+ patients directly after progression on their first and only TKI therapy, and the TIGER3 study, in later-line patients directly after

progression on their second or later TKI therapy or subsequent chemotherapy, are planned to initiate by the end of Q2 2014. The Phase 2 portion of the TIGER1 study, which is a randomized Phase 2/3 registration study of CO-1686 vs. erlotinib in newly-diagnosed EGFR mutant patients who have not had TKI therapy but who may have received one type of chemotherapy, will begin in the second quarter of 2014 as well. The Company also expects to initiate its Phase 1 study in Japan during the first quarter of 2014.

37.     The next day, Clovis filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2013.  The Form 10-K was signed by Defendants Mahaffy, Atwood, Barrett, Blair, Flaherty, Graham, Klingenstein, McKinley and Spickschen and reaffirmed the Company's financial results previously announced on February 27, 2014.

38.     On May 8, 2014, Defendants caused the Company to issue a press release entitled, "Clovis Oncology Announces First Quarter 2014 Operating Results."   The press release stated in relevant part:

- ***Encouraging CO-1686 clinical activity and progression-free survival (PFS) in non-small cell lung cancer (NSCLC) reported at European Lung Cancer Conference in late March;***
- ***CO-1686 Phase 2 expansion cohorts enrolling***
- ***TIGER1 and TIGER2 studies to initiate shortly***
- ***CO-1686 New Drug Application (NDA) submission planned by mid-2015***
- ***Clovis to present updated data on its pipeline products at ASCO May 30-June 3***

BOULDER, Colo.--(BUSINESS WIRE)--May 8, 2014--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its first quarter ended March 31, 2014, and provided an update on the Company's clinical development programs for the rest of 2014.

"This is an exciting time for our clinical development programs and I am proud of what our team has accomplished to date," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "During the next few months, we are initiating two of our Phase 2 global TIGER studies for CO-1686 in EGFR-driven NSCLC, the Phase 2 study of rucaparib in pancreatic cancer patients with BRCA mutations, as well as Phase 2 studies of lucitanib in both breast cancer and squamous NSCLC. We look forward to providing updates for each of our products in development at ASCO

14

later this month, and continuing to advance our clinical programs into later-stage development, most importantly, with the intention to utilize the CO-1686 Phase 2 expansion cohorts and TIGER2 as the basis for an NDA submission to the FDA by mid-2015."

### Q1 2014 Financial Results and Financial Outlook

Clovis reported a net loss for the first quarter of 2014 of $30.7 million, or $0.91 per share. Net cash burn for the first quarter of 2014 was $19.6 million. The Company's net loss was impacted by a number of infrequently occurring transactions, including the following:

- Milestone revenue of $13.6 million pursuant to our collaboration and license agreement for lucitanib with Les Laboratoires Servier (Servier), earned as a result of the expiration of the opposition period of a lucitanib European patent.

- Acquired in-process research and development expense totaling $8.4 million associated with milestone payments incurred for CO-1686 ($5.0 million for the initiation of a Phase 2 clinical study) and lucitanib ($3.4 million as a pass-through of a portion of the patent milestone received from Servier).

- $3.4 million of amortization expense of an intangible asset that was established as part of the purchase accounting for the acquisition of EOS S.p.A. (EOS) in the fourth quarter of 2013. This amortization expense was also triggered by the receipt of the milestone payment from Servier.

- Income tax expense of $2.1 million, due primarily to projected 2014 taxable income earned in Italy as a result of the receipt of the Servier milestone payment.

The Company's net loss for the first quarter of 2013 totaled $15.7 million, or $0.60 per share. The increase in the loss for the first quarter of 2014 is due primarily to expanded development activities for the CO-1686 and rucaparib programs as Clovis initiated additional clinical studies in both programs.

Research and development expenses totaled $24.2 million for the first quarter of 2014, compared to $12.1 million for the first quarter of 2013. The increase in expense is due to the initiation of the ARIEL2 and ARIEL3 studies for rucaparib, an increase in the number of patients enrolled in the Phase 1/2 study for CO-1686, the initiation of the TIGER2 and the Japanese Phase 1 studies for CO-1686, and increased manufacturing of clinical drug supplies for the CO-1686 and rucaparib programs.

General and administrative expenses totaled $5.3 million for the first quarter of 2014, compared to $3.2 million for the first quarter of 2013. This increase is largely

15

due to higher share-based compensation expense for employees engaged in general and administrative activities.

Operating expenses for the first quarter of 2014 totaled $42.1 million, inclusive of the acquired in-process research and development and amortization expenses described above. Total operating expenses include non-cash charges totaling $9.2 million for share-based compensation expense, amortization of an intangible asset, and the accretion of contingent purchase consideration associated with the EOS acquisition.

As of March 31, Clovis had $303.7 million in cash and cash equivalents and 33.9 million outstanding shares of common stock. The Company continues to expect cash burn for 2014 will total approximately $120 million and to end the year with approximately $200 million in cash.

**Progress Toward 2014 Key Milestones and Objectives**

The Company has substantive clinical, regulatory and development objectives for 2014 for each of its products; highlights of recent progress and planned objectives follow.

<u>CO-1686</u>

An update of clinical results from the CO-1686 Phase 1 study were presented in a Proffered Paper (Oral) presentation during the 4th European Lung Cancer Conference (ELCC) in Geneva in late March by Heather Wakelee, MD, Associate Professor of Medicine, Oncology at Stanford University, and an investigator participating in the study. Highlights of the data presented include the following:

- Evidence of activity: Fourteen RECIST partial responses (PRs) were achieved in 22 evaluable T790M positive patients, for an objective response rate of 64 percent; ten of those responders started CO-1686 therapy immediately following progression on a prior TKI. Twenty of the 22 evaluable T790M positive patients, or 91 percent, have experienced stable disease or a PR. While median duration of response cannot yet be estimated in the T790M positive patients, PFS greater than six months in the evaluable, heavily-pretreated T790 positive patient population has been observed with the median not yet reached. Median PFS in T790M negative patients was approximately three months.

- Safety: CO-1686 is well-tolerated, with only one patient who discontinued treatment with CO-1686 due to adverse events. The Company has seen no evidence of TKI-related EGFR wild-type rash and diarrhea at any dose or formulation studied. The most common adverse events were hyperglycemia, nausea, diarrhea, decreased appetite and vomiting, and these were mostly grade 1 in severity. The most common

grade 3 adverse event was hyperglycemia, which was observed in 19 percent of patients. This is readily managed with a commonly-prescribed single oral agent. Grade 3 QTc prolongation was observed in five percent of patients and was asymptomatic.

The next update of CO-1686 clinical data will be presented at the 2014 American Society of Clinical Oncology Annual Meeting in a Clinical Science Symposium on lung cancer taking place on Saturday, May 31.

CO-1686 is the only EGFR-directed therapy to spare wild-type EGFR in clinical studies, which the Company believes represents a significant point of differentiation from approved EGFR inhibitors and those currently in clinical development.

The Company is currently enrolling two Phase 2 expansion cohorts of its Phase 1/2 study in EGFR mutant patients with the T790M mutation; the first includes approximately 150 to 200 T790M positive patients directly after progression on their first and only TKI therapy, comparable to the population we will seek to enroll in our TIGER2 registration study. The second cohort includes approximately 150 to 200 later-line T790M positive patients after progression on their second or later TKI therapy or subsequent chemotherapy. Both cohorts are exploring doses of 500mg, 625mg and 750mg BID. Given the meaningful efficacy now observed at each of these doses, Clovis no longer intends to pursue a dose of 1000mg BID as there is no evident increase in efficacy to offset the increased and dose-related toxicities.

Data from the expansion cohorts, combined with data from TIGER2, are expected to serve as the basis of an NDA submission for CO-1686 by mid-2015.

Clovis expects to initiate three registration studies in the TIGER program during 2014. The TIGER2 study, in T790M positive patients directly after progression on their first and only TKI therapy, is expected to begin enrolling patients at a dose of 625mg BID during the second quarter. The Phase 2 portion of the TIGER1 study, which is a randomized Phase 2/3 registration study of CO-1686 vs. erlotinib in newly-diagnosed EGFR mutant patients is expected to begin in mid-2014, and the TIGER3 study, a randomized, comparative study versus chemotherapy in T790M positive patients directly after progression on their first and only TKI therapy, is expected to initiate during the second half of 2014.

The Company initiated its Phase 1 study of CO-1686 in Japan during the first quarter of 2014.

39.     The next day on May 9, 2014, the Company filed its Quarterly Report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2014.  The Company's Form 10-Q was signed by Defendant Mahaffy and reaffirmed the Company's financial results previously announced on May 8, 2014.

40.     On August 7, 2014, Defendants caused the Company to issue a press release entitled, "Clovis Oncology Announces Second Quarter 2014 Operating Results".  The press release stated in relevant part:

- ***CO-1686 NDA submission expected by mid-2015***
- ***CO-1686 Breakthrough Therapy designation granted during Q2***
- ***Proposed INN rociletinib assigned to CO-1686***
- ***Rociletinib and rucaparib data updates to be presented at medical conferences in Fall 2014***

BOULDER, Colo.--(BUSINESS WIRE)--August 7, 2014--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its second quarter ended June 30, 2014, and provided an update on the Company's clinical development programs for the rest of 2014.

"This is a very busy and exciting time at our Company," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "We are rapidly enrolling patients in the rociletinib (CO-1686) Phase 2 expansion cohorts and TIGER2 studies, preparing for our NDA submission in mid-2015 and beginning to build out our commercial and medical affairs leadership in anticipation of a potential launch by year-end 2015. Additionally, the emerging results from the rucaparib ARIEL2 study are extremely encouraging and we look forward to presenting data for each of these programs at scientific meetings in the fall."

**Q2 2014 Financial Results and Financial Outlook**

Clovis reported a net loss for the second quarter of 2014 of $34.8 million ($1.03 per share), and $65.5 million ($1.93 per share) for the first half of 2014, compared to net losses of $19.3 million ($0.72 per share) and $35.0 million ($1.33 per share) for the comparable periods of 2013, respectively. In the first quarter of 2014, the Company recorded milestone revenue of $13.6 million received pursuant to our collaboration and license agreement for lucitanib and also recognized charges for acquired in-process research and development expense totaling $8.4 million associated with milestone payments incurred for rociletinib and lucitanib. An

additional charge for acquired in-process research and development expense of $0.4 million was recorded in the second quarter of 2014 related to the achievement of a Phase 2 milestone for rucaparib.

Research and development expenses totaled $28.4 million for the second quarter of 2014 and $52.6 million for the first half of 2014, compared to $15.8 million for the second quarter and $27.9 million for the first half of 2013. The increase in expenses for both the three and six month periods is due primarily to the initiation of the ARIEL2 and ARIEL3 studies for rucaparib, an increase in the number of patients enrolled in the Phase 1/2 study for rociletinib, the initiation of the TIGER2 and the Japanese Phase 1 studies for rociletinib, increased manufacturing of clinical drug supplies for the rociletinib and rucaparib programs, and increased personnel-related expenses associated with the hiring of additional staff to support the Company's expanded development activities.

General and administrative expenses totaled $5.3 million for the second quarter of 2014 and $10.6 million for the first half of 2014, compared to $3.5 million for the second quarter and $6.7 million for the first half of 2013. The increase for both periods is primarily due to higher share-based compensation expense for employees engaged in general and administrative activities.

Operating expenses for the second quarter of 2014 totaled $35.0 million, and $77.1 million for the first half of 2014, inclusive of the acquired in-process research and development expense described above. Total operating expenses include non-cash charges totaling $6.1 million for the second quarter and $15.2 million for the first half of 2014 for share-based compensation expense and amortization of an intangible asset and the accretion of contingent purchase consideration associated with the EOS acquisition.

Net cash burn for the second quarter of 2014 totaled $30.4 million, up from $19.6 million for the first quarter of 2014. The increase in cash burn is primarily due to the $13.6 million milestone payment received in the first quarter of 2014, as described above. As of June 30, Clovis had $273.2 million in cash and cash equivalents and 33.9 million outstanding shares of common stock. The Company continues to expect cash burn for 2014 will total approximately $120 million and to end the year with approximately $200 million in cash.

**Progress Toward 2014 Key Milestones and Objectives**

The Company has substantive clinical, regulatory and development objectives for 2014 for each of its products; highlights of recent progress and planned objectives follow.

<u>Rociletinib</u>

An update of clinical data from the rociletinib Phase 1/2 study were presented in early June in an oral session at the American Society of Clinical Oncology (ASCO) Annual Meeting. Highlights from the data presented for evaluable, centrally-confirmed T790M positive patients treated at a therapeutic dose of rociletinib included a 58 percent objective response rate, and a 90 percent disease control rate. The median duration of response could not yet be determined, and similarly, median progression-free survival (PFS) had not yet been reached. However, follow-up for some patients exceeded one year and the estimate for median PFS was greater than 12 months. Rociletinib is well-tolerated, with no evidence of wild-type EGFR inhibition. The most common adverse events were nausea, hyperglycemia, diarrhea, vomiting and decreased appetite, and these were mostly grade 1 or 2 in severity.

Rociletinib is the only EGFR-directed therapy to spare wild-type EGFR in clinical studies, which the Company believes represents a significant point of differentiation from approved EGFR inhibitors and those currently in clinical development.

The next update of CO-1686 clinical data is expected to take place at the 26th EORTC-AACR-NCI Symposium on Molecular Targets and Cancer Therapeutics in Barcelona in mid-November.

The Company is currently enrolling two Phase 2 expansion cohorts of its Phase 1/2 study in EGFR mutant patients with the T790M mutation; the first includes approximately 150 to 200 T790M positive patients directly after progression on their first and only TKI therapy, comparable to the TIGER2 registration study patient population. The second cohort includes approximately 150 to 200 later-line T790M positive patients after progression on their second or later TKI therapy or subsequent chemotherapy. Both cohorts are exploring doses of 500mg, 625mg and 750mg BID. The TIGER2 study, in T790M positive patients directly after progression on their first and only TKI therapy, began enrolling patients earlier in the second quarter at a dose of 625mg BID.

Data from the expansion cohorts, combined with data from TIGER2, are expected to serve as the basis of an NDA submission for rociletinib by mid-2015.

In May, the U.S. FDA granted Breakthrough Therapy designation for rociletinib as treatment for mutant NSCLC in patients with the T790M mutation after progression on EGFR-directed therapy.

Clovis expects to initiate two more studies in the TIGER program during 2014. The TIGER1 study, a randomized Phase 2/3 registration study of rociletinib versus erlotinib in newly-diagnosed EGFR mutant patients is expected to begin shortly. The TIGER3 study, a randomized, comparative study of rociletinib versus chemotherapy in patients with EGFR-mutant NSCLC and acquired TKI resistance,

is expected to begin during the second half of 2014. In addition, the Company initiated its Phase 1 study of rociletinib in Japan earlier this year

41.    On August 8, 2014, the Company filed its Quarterly Report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2014.  The Company's Form 10-Q was signed by Defendant Mahaffy and reaffirmed the Company's financial results previously announced on August 7, 2014.

42.    On November 6, 2014, Defendants caused the Company to issue a press release, entitled, "Clovis Oncology Announces Third Quarter 2014 Operating Results."  The press release stated in relevant part"

- *Data updates for rucaparib and rociletinib to be presented in oral presentations at the ENA Symposium November 20 and 21*
- *$278.3 million raised in September sale of senior convertible notes*
- *Encouraging rucaparib data in ovarian cancer presented at ESMO*
- *First patients enrolled in lucitanib Phase 2 studies in breast cancer and squamous NSCLC*
- *Rociletinib (CO-1686) NDA and MAA submissions expected in mid-2015*

BOULDER, Colo.--(BUSINESS WIRE)--November 6, 2014--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its third quarter ended September 30, 2014, and provided an update on the Company's clinical development programs for the rest of 2014.

"We look forward to presenting interim data later this month at ENA 2014 from the Phase 2 TIGER-X study of rociletinib in EGFR-driven non-small cell lung cancer, and the first clinical outcomes data, including in the pre-specified BRCA-ness population, from the prospective ARIEL2 treatment study of rucaparib in ovarian cancer," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "In addition, we remain on track to submit our NDA for rociletinib in mid-2015, and we continue to prepare for and build out our commercial and medical affairs leadership teams in anticipation of a potential U.S. launch by year-end 2015."

**Q3 2014 Financial Results and Financial Outlook**

Clovis reported a net loss for the third quarter of 2014 of $39.6 million ($1.17 per share), and $105.1 million ($3.10 per share) for the first nine months of 2014,

compared to net losses of $20.3 million ($0.68 per share) and $55.3 million ($2.00 per share) for the comparable periods of 2013, respectively.

Research and development expenses totaled $35.0 million for the third quarter of 2014 and $87.6 million for the first nine months of 2014, compared to $16.1 million for the third quarter and $44.0 million for the first nine months of 2013. The increase in expenses for both the three and nine month periods is due primarily to the initiation of the ARIEL2 and ARIEL3 studies for rucaparib, an increase in the number of patients enrolled in the Phase 1/2 study for rociletinib, the initiation of the TIGER-2 and the Japanese Phase 1 studies for rociletinib, increased manufacturing of clinical drug supplies for the rociletinib and rucaparib programs, and increased personnel-related expenses associated with the hiring of additional staff to support the Company's expanded development activities.

General and administrative expenses totaled $5.3 million for the third quarter of 2014 and $15.9 million for the first nine months of 2014, compared to $4.3 million for the third quarter and $11.0 million for the first nine months of 2013. The increase for both periods is primarily due to higher share-based compensation expense for employees engaged in general and administrative activities.

In the first quarter of 2014, the Company recorded milestone revenue of $13.6 million received pursuant to our collaboration and license agreement for lucitanib and also recognized charges for acquired in-process research and development expense totaling $8.4 million associated with milestone payments incurred for rociletinib and lucitanib. An additional charge for acquired in-process research and development expense of $0.4 million was recorded in the second quarter of 2014 related to the achievement of a Phase 2 milestone for rucaparib.

Operating expenses for the third quarter of 2014 totaled $41.1 million, and $118.2 million for the first nine months of 2014, inclusive of the acquired in-process research and development expense described above. Total operating expenses include non-cash charges totaling $6.3 million for the third quarter and $21.5 million for the first nine months of 2014 for share-based compensation expense and amortization of an intangible asset and the accretion of contingent purchase consideration associated with the 2013 acquisition of Ethical Oncology Science, S.p.A.

Net cash burn for the third quarter of 2014 totaled $35.0 million, and $85.0 million for the first nine months of 2014. As of September 30, Clovis had $516.6 million in cash and cash equivalents and 34.0 million outstanding shares of common stock. In September 2014, the Company raised net proceeds of $278.3 million through its sale of 2.5% convertible senior notes. The Company continues to expect operating cash burn for 2014 will total approximately $120 million and to end the year with approximately $480 million in cash.

**Progress Toward 2014 Key Milestones and Objectives**

Highlights of recent progress and planned objectives for each product follows:

<u>Rociletinib</u>

Rociletinib is an oral, potent, mutant-selective inhibitor of epidermal growth factor receptor (EGFR) under investigation for the treatment of EGFR-mutated non-small cell lung cancer (NSCLC). Rociletinib targets the activating mutations of EGFR (L858R and Del19), while also inhibiting the primary resistance mutation, T790M, which develops in 60 percent of patients treated with first- and second-generation EGFR inhibitors.

As reported at ASCO earlier this year, rociletinib has demonstrated compelling efficacy in a heavily pre-treated, Western population of patients with acquired resistance to currently available EGFR inhibitors. Rociletinib is the only EGFR-directed therapy that has been shown to spare wild-type EGFR in clinical studies. Inhibition of wild-type EGFR is associated with cutaneous (and other) toxicities such as acneiform rash, stomatitis and paronychia, all of which may significantly impact patients' quality of life, result in treatment discontinuation and cause patient distress. The Company believes this aspect of rociletinib's clinical profile represents a significant point of differentiation from approved EGFR inhibitors and those currently in clinical development. In May, the U.S. FDA granted Breakthrough Therapy designation for rociletinib as treatment for mutant NSCLC in patients with the T790M mutation after progression on EGFR-directed therapy.

The next update of rociletinib clinical data will take place at the 26th EORTC-NCI-AACR (ENA) Symposium on Molecular Targets and Cancer Therapeutics in Barcelona on November 21.

Data from the TIGER-X study, combined with data from the TIGER-2 study, are expected to serve as the basis of U.S. and E.U. regulatory submissions for rociletinib in mid-2015. The Company is currently enrolling the two Phase 2 expansion cohorts of TIGER-X in EGFR mutant patients with the T790M mutation; the first includes T790M positive patients directly after progression on their first and only tyrosine kinase inhibitor (TKI) therapy, comparable to the TIGER-2 registration study patient population. The second cohort includes later-line T790M positive patients after progression on their second or later TKI therapy or subsequent chemotherapy. The TIGER-2 study, in T790M positive patients directly after progression on their first and only TKI therapy, began enrolling patients earlier in the second quarter. The TIGER-1 study, a randomized Phase 2/3 registration study of rociletinib versus erlotinib in newly-diagnosed EGFR mutant patients has just commenced. In addition, the Company initiated its Phase 1 study of rociletinib in Japan earlier this year.

23

In addition, Clovis expects to initiate the TIGER-3 study, a randomized, comparative study of rociletinib versus chemotherapy in T790M positive and T790M negative patients with EGFR-mutant NSCLC and acquired TKI resistance in the next few months.

43.     The next day on November 7, 2014, the Company filed its Quarterly Report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2014.  The Company's Form 10-Q was signed by Defendant Mahaffy and reaffirmed the Company's financial results previously announced on November 6, 2014.

44.     On February 25, 2015, Defendants caused the Company to issue a press release entitled, "Clovis Oncology Announces 2014 Operating Results."   The press release stated in relevant part as follows:

- ***Rociletinib (CO-1686) NDA and MAA submissions for EGFR-mutant lung cancer planned mid-2015***
- ***Rucaparib development program accelerated; filing now planned for treatment of platinum-sensitive ovarian cancer in 2016***

BOULDER, Colo.--(BUSINESS WIRE)--February 25, 2015--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its quarter and year ended December 31, 2014, and provided an update on the Company's clinical development programs for 2015.

"We believe that 2015 will be a transformative year for us, as we prepare to submit our NDA and MAA for rociletinib in advanced EGFR-mutant lung cancer to the U.S. and E.U. regulatory authorities mid-year, and accelerate our pivotal program for rucaparib to enable 2016 submissions for advanced ovarian cancer for BRCA-mutant and for BRCAness patient populations," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "All of this activity builds on what was a very exciting 2014."

**2014 Financial Results and 2015 Financial Outlook**

Clovis reported a net loss for the fourth quarter of 2014 of $54.9 million ($1.62 per share), and $160.0 million ($4.72 per share) for the year ended December 31, 2014. This compares to a net loss of $29.2 million ($0.92 per share) for the fourth quarter and $84.5 million ($2.95 per share) for the year ended December 31, 2013.

Research and development expenses totaled $50.1 million for the fourth quarter of 2014 and $137.7 million for the full year 2014, compared to $22.5 million for the fourth quarter and $66.5 million for the full year 2013. The increase in expenses for both periods is due to the significantly expanded clinical development activities for rociletinib and rucaparib, increased manufacturing of clinical drug supplies for the rociletinib and rucaparib programs, and increased personnel-related expenses associated with the hiring of additional staff to support the Company's expanded development activities.

General and administrative expenses totaled $5.6 million for the fourth quarter of 2014 and $21.5 million for the full year 2014, compared to $5.5 million for the fourth quarter and $16.6 million for the full year 2013. The modest increase year over year is primarily due to higher share-based compensation expense for employees engaged in general and administrative activities.

In the first quarter of 2014, the Company recorded milestone revenue of $13.6 million received pursuant to our collaboration and license agreement for lucitanib and also recognized charges for acquired in-process research and development expense totaling $8.4 million associated with milestone payments incurred for rociletinib and lucitanib. An additional charge for acquired in-process research and development expense of $0.4 million was recorded in the second quarter of 2014 related to the achievement of a Phase 2 milestone for rucaparib.

Operating expenses for the fourth quarter of 2014 totaled $53.9 million, and $172.1 million for the full year 2014, inclusive of the acquired in-process research and development expense described above. Total operating expenses include non-cash charges totaling $4.1 million for the fourth quarter and $25.6 million for the full year 2014 for share-based compensation expense, amortization of an intangible asset, and the accretion of contingent purchase consideration associated with the 2013 acquisition of Ethical Oncology Science, S.p.A.

Net cash burn for the fourth quarter of 2014 totaled $34.2 million, and $120.0 million for the full year 2014. As of December 31, Clovis had $482.7 million in cash and cash equivalents and 34.0 million outstanding shares of common stock.

**2015 Key Milestones and Objectives**

Highlights of planned objectives for each product follows:

Rociletinib

Rociletinib is an oral, potent, mutant-selective inhibitor of epidermal growth factor receptor (EGFR) under investigation for the treatment of EGFR-mutated non-small cell lung cancer (NSCLC). Rociletinib targets the activating mutations of EGFR (L858R and Del19), while also inhibiting the primary resistance mutation, T790M,

which develops in approximately 60 percent of patients treated with first- and second-generation EGFR inhibitors.

Data presented in late 2014 demonstrated an objective response rate (ORR) of 67 percent in 27 evaluable T790M-positive patients receiving either 625mg or 500mg BID (the clinical dose group). The ORR was comparable in the 625mg BID and 500mg BID dose groups. The disease control rate was 89 percent and was also consistent across doses. The immature median PFS was 10.4 months, with follow-up for some patients exceeding one year. Data presented to date demonstrate that rociletinib is well-tolerated, with no evidence of systemic wild-type EGFR inhibition. The only common grade 3/4 toxicity reported was hyperglycemia (14 percent), which was readily managed with an oral hypoglycemic agent.

In addition, data for 19 T790M-negative patients receiving either 625mg or 500mg BID were presented in January 2015. An ORR of 42 percent was observed in these patients. The immature median PFS was 7.5 months. Based on this observed activity, the Company is now actively exploring rociletinib as treatment for T790M-negative patients, where a significant unmet medical need exists.

Initial data from two single-arm studies (TIGER-X and TIGER-2) are expected to serve as the basis of U.S. and E.U. regulatory submissions for rociletinib in mid-2015. The Company continues to enroll patients in the two Phase 2 expansion cohorts of TIGER-X in EGFR mutant patients with the T790M mutation.

In addition to TIGER-X, three global registration studies are currently planned or underway as part of the TIGER program:

- TIGER-1, a randomized Phase 2/3 study of rociletinib vs. erlotinib in EGFR mutant patients who have not had TKI therapy, but who may have received one type of chemotherapy;

- TIGER-2, a single-arm study in second-line patients immediately after progression on their first and only TKI therapy, which includes both T790M-positive and T790M-negative cohorts; and

- TIGER-3, a randomized study of rociletinib vs. chemotherapy in later-line patients progressing on second or later TKI or subsequent chemotherapy, which includes both T790M-positive and T790M-negative cohorts.

A Phase 1 study of rociletinib is also underway in Japan and the Company intends to initiate combination studies with several targeted therapeutics and checkpoint inhibitors during 2015; initially, these include planned combinations with PDL1, PD1, MEK and Aurora kinase inhibitors.

45.    On February 27, 2015, the Company filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2015.  The Company's Form 10-K was signed by Defendants Mahaffy, Atwood, Barrett, Blair, Flaherty, Graham, Klingenstein, McKinley and Spickschen and reaffirmed the Company's financial results previously announced on February 25, 2015.

46.    On May 6, 2015, Defendants caused the Company to issue a press release entitled, "Clovis Oncology Announces First Quarter 2015 Operating Results."  The press release stated in relevant part:

- ***Rociletinib (CO-1686) rolling NDA submission for EGFR-mutant lung cancer expected to commence in June, and complete by July/August***
- ***Launch planning underway for potential late 2015 U.S. launch of rociletinib***
- ***Phase 1/2 rociletinib data published in April 30 issue of the New England Journal of Medicine***
- ***Rucaparib granted Breakthrough Therapy designation in April***
- ***NDA filing for rucaparib planned for treatment of advanced ovarian cancer in 2016***
- ***Oral presentations for rociletinib and rucaparib at ASCO 2015***

BOULDER, Colo.--(BUSINESS WIRE)--May 6, 2015--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its quarter ended March 31, 2015, and provided an update on the Company's clinical development programs for 2015.

"2015 is proving to be a very exciting and important year for us, as we are preparing our near-term regulatory submissions seeking approval in the U.S. and E.U. for rociletinib in advanced EGFR-mutant lung cancer and planning for our first commercial launch by year-end. We are also pleased to have substantially accelerated the development of rucaparib in both mutant BRCA and the broader BRCA-like population for advanced ovarian cancer, with an NDA submission planned for 2016," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "The extremely compelling results for rucaparib to date in mutant BRCA ovarian cancer were also recognized by the FDA, resulting in our second product receiving Breakthrough Therapy designation."

**First Quarter 2015 Financial Results**

The Company reported no revenues for the first quarter of 2015, compared to $13.6 million for the first quarter of 2014 which consisted of a milestone payment

pursuant to its collaboration and license agreement for lucitanib with Les Laboratoires Servier (Servier), earned as a result of the expiration of the opposition period of a lucitanib European patent.

Research and development expenses totaled $56.8 million for the first quarter of 2015, compared to $24.2 million for the first quarter 2014. The increase in expenses is due to the significantly expanded clinical development activities for rociletinib and rucaparib, increased launch planning activities for rociletinib and increased personnel-related expenses associated with the hiring of additional staff to support the Company's expanded activities.

General and administrative expenses totaled $6.8 million for the first quarter of 2015, compared to $5.3 million for the first quarter of 2014. The year over year increase is primarily due to higher share-based compensation expense for employees engaged in general and administrative activities and increased facility costs.

Total operating expenses for the first quarter of 2015 were $64.2 million, compared to $42.1 million for the first quarter of 2014. Operating expenses for the first quarter of 2014 are inclusive of $8.4 million acquired in-process research and development expenses associated with milestone payments incurred for rociletinib and lucitanib and $3.4 million of amortization expense of an intangible asset.

Net loss attributable to common shareholders was $63.1 million, or $1.86 per share, for the first quarter of 2015 compared to a net loss of $30.7 million, or $0.91 per share, for the first quarter of 2014. Net loss for the first quarter of 2015 included share-based compensation expense of $8.7 million compared to $4.9 million for the first quarter of 2014.

Clovis had $433.4 million in cash, cash equivalents and available-for-sale securities and approximately 34.1 million outstanding shares of common stock as of March 31, 2015.

### 2015 Key Milestones and Objectives

Highlights of planned objectives for each product follows:

<u>Rociletinib</u>

Rociletinib is an oral, potent, mutant-selective inhibitor of epidermal growth factor receptor (EGFR) under investigation for the treatment of EGFR-mutated non-small cell lung cancer (NSCLC). Rociletinib targets the activating mutations of EGFR (L858R and Del19), while also inhibiting the dominant acquired resistance mutation, T790M, which develops in approximately 60 percent of patients treated with first- and second-generation EGFR inhibitors.

Initial data from two single-arm studies (TIGER-X and TIGER-2) are expected to serve as the basis of U.S. and E.U. regulatory submissions for rociletinib during 2015. The rolling NDA submission to the FDA for advanced EGFR-mutant NSCLC is expected to commence in June and complete in July or August of 2015.

In addition to TIGER-X, three global registration studies are currently enrolling as part of the TIGER program:

- TIGER-1, a randomized Phase 2/3 study of rociletinib vs. erlotinib in newly diagnosed EGFR mutant lung cancer patients;

- TIGER-2, a single-arm study in second-line patients immediately after progression on their first and only TKI therapy, which includes both T790M-positive and T790M-negative cohorts; and

- TIGER-3, a randomized study of rociletinib vs. chemotherapy in later-line patients progressing on second or later TKI or subsequent chemotherapy, which includes both T790M-positive and T790M-negative cohorts.

The Phase 1 study of rociletinib in Japan has completed enrollment and a Phase 2 study in Japanese patients, agreed upon with Japanese regulatory authorities, is expected to initiate in the second half of 2015. In addition, the Company is exploring combination studies with several targeted therapeutics and checkpoint inhibitors and expects that three of these combinations – with inhibitors of PD-L1, PD-1 and MEK – will initiate during the second half of 2015.

Data from the Phase 1/2 study of rociletinib (TIGER-X) were published in the April 30 edition of the *New England Journal of Medicine*. The manuscript included data on the 130 patients enrolled as of June 2014; all had received at least one prior line of EGFR TKI therapy. The patient population was heavily pretreated with very advanced disease; the median number of prior therapies was four, and 72 percent of the patients were taking an EGFR TKI at the time of consent. Fifty percent of patients (65/130) had three or more sites of metastatic disease, and 44 percent had a history of brain metastases (57/130). In the forty-six evaluable patients who possessed the T790M mutation and were treated with a therapeutic dose of rociletinib, overall response rate (ORR) was 59 percent, and immature median progression-free survival (PFS) was 13.1 months. In the 17 evaluable patients who tested negative for the T790M mutation and were treated with a therapeutic dose, the ORR was 29 percent and immature median PFS was 5.6 months. Treatment-related adverse events (AEs) were generally infrequent and mild, and the predominant grade 3 AE was hyperglycemia, occurring in 22 percent of patients treated with efficacious doses (n=92). These data continue to mature.

The next update of clinical data from the ongoing TIGER studies will be presented in an oral presentation at the 2015 American Society of Clinical Oncology Annual Meeting.

47.    On May 8, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2015.  The Company's Form 10-Q was signed by Defendant Mahaffy and reaffirmed the Company's financial results previously announced on May 6, 2015.

48.    On August 6, 2015, Defendants caused the Company to issue a press release entitled, "Clovis Oncology Announces Second Quarter 2015 Operating Results." The press release stated in relevant part as follows:

- ***Completed rociletinib (CO-1686) U.S. NDA and E.U. MAA regulatory submissions in July for patients with EGFR-mutant non-small cell lung cancer who have been previously treated with an EGFR-targeted therapy and have the T790M mutation***
- ***Preparing for potential Q4 2015 U.S. launch of rociletinib; establishing European commercial organization for potential 2016 launch of rociletinib***
- ***Raised $298 million in July equity offering; June 30, 2015 pro forma cash and available-for-sale securities balance of $676 million***

BOULDER, Colo.--(BUSINESS WIRE)--August 6, 2015--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its quarter ended June 30, 2015, and provided an update on the Company's clinical development programs for 2015.

"This is a very exciting time for our company," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "We have completed our first rociletinib NDA and MAA submissions, we are building out our commercial organizations in both the U.S. and E.U., and we are preparing for a potential U.S. launch as early as the end of this year. We are quickly accelerating toward becoming a global commercial biopharmaceutical organization."

**Second Quarter 2015 Financial Results**

The Company reported no revenues for the second quarter and first half of 2015, compared to $13.6 million for the first quarter and first half of 2014 which consisted of a milestone payment pursuant to its collaboration and license agreement for lucitanib with Les Laboratoires Servier (Servier).

30

Research and development expenses totaled $60.4 million for the second quarter of 2015 and $117.1 million for the first half of 2015, compared to $28.4 million and $52.6 million for the comparable periods in 2014. The increase in expenses for both the three- and six-month periods is due to the significantly expanded clinical development activities for rociletinib and rucaparib, increased launch planning activities for rociletinib and increased personnel-related expenses associated with the hiring of additional staff to support the Company's expanded activities.

General and administrative expenses totaled $7.2 million for the second quarter of 2015 and $14.0 million for the first half of 2015, compared to $5.3 million and $10.6 million for the comparable periods in 2014. The year over year increase is primarily due to higher share-based compensation and personnel expense for employees engaged in general and administrative activities, increased facility costs and higher professional service fees.

Net loss attributable to common shareholders was $71.5 million ($2.10 per share) for the second quarter of 2015 and $134.7 million ($3.96 per share) for the first half of 2015, compared to a net loss of $34.8 million ($1.03 per share) and $65.5 million ($1.93 per share) for the comparable periods of 2014. Share-based compensation expense totaled $8.4 million for the second quarter of 2015 and $17.1 million for the first half of 2015.

Clovis had $377.6 million in cash, cash equivalents and available-for-sale securities and approximately 34.1 million outstanding shares of common stock as of June 30, 2015. In July 2015, the Company raised net proceeds of $298.0 million through an offering of 4.1 million shares of common stock.

## 2015 Key Milestones and Objectives

Highlights of planned or completed objectives for each product follows:

Rociletinib

Rociletinib is an oral, potent, mutant-selective inhibitor of epidermal growth factor receptor (EGFR) under investigation for the treatment of EGFR-mutated non-small cell lung cancer (NSCLC). Rociletinib targets the activating mutations of EGFR (L858R and Del19), while also inhibiting the dominant acquired resistance mutation, T790M. The T790M mutation develops in approximately 60 percent of patients treated with first- and second-generation EGFR inhibitors.

On July 30, 2015, the Company submitted its New Drug Application (NDA) regulatory filing to the U.S. Food and Drug Administration (FDA) for rociletinib for the treatment of patients with mutant EGFR NSCLC who have been previously treated with an EGFR-targeted therapy and have the EGFR T790M mutation as detected by an FDA approved test. Rociletinib was granted Breakthrough Therapy

designation by the U.S. FDA in May 2014. Clovis also submitted its Marketing Authorization Application (MAA) to the European Medicines Agency (EMA) through the centralized procedure for rociletinib for the same indication. There is a validation period before both applications are formally accepted, after which the review commences.

The U.S. and E.U. regulatory submissions include data from two single-arm studies, TIGER-X and TIGER-2. During the second quarter, updated findings from the TIGER-X study, evaluating the safety and activity of rociletinib in a very advanced EGFR-mutant NSCLC patient population were presented at the 2015 American Society of Clinical Oncology (ASCO) annual meeting. Highlights of the data presented included the following:

- 60% overall response rate (ORR) and 90% disease control rate (DCR) in heavily pretreated centrally confirmed tissue T790M-positive patients at the 500mg BID dose
- Median progression free survival (PFS) of 10.3 months observed in patients without a history of CNS metastases; median PFS of 8 months observed in an overall population of 270 heavily pretreated centrally confirmed tissue T790M-positive patients, including 40% of patients with a history of CNS metastases
- 37% ORR in centrally confirmed tissue T790M-negative patients
- 57% ORR and 80% DCR in centrally confirmed plasma-genotyped T790M-positive patients – may allow for broader testing for mutations in patients ineligible for tissue biopsy
- Well-tolerated; the most frequent adverse reactions or lab abnormalities reported were diarrhea, nausea, fatigue, QTc prolongation and hyperglycemia; the only Grade 3 adverse reaction or lab abnormality reported in greater than 5% of patients was hyperglycemia

49.     The next day on August 7, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2015. The Company's Form 10-Q was signed by Defendant Mahaffy and reaffirmed the Company's financial results previously announced on August 6, 2015.

50.     On November 5, 2015, the Company issued a press release entitled, "Clovis Oncology Announces Third Quarter 2015 Operating Results." The press release stated in relevant part:

- ***New Drug Application (NDA) for rociletinib for the treatment of advanced EGFR-mutant T790M+ non-small cell lung cancer (NSCLC) on file with U.S. FDA***
- ***Marketing Authorization Application (MAA) for rociletinib on file in E.U.; action expected mid-2016***
- ***Raised $298 million in July equity offering***
- ***Enrollment now complete in mutant BRCA population required for U.S. NDA submission for rucaparib in advanced ovarian cancer***
- ***Rucaparib U.S. NDA submission planned Q2 2016***
- ***Erle Mast, Clovis' Chief Financial Officer, announces his retirement effective March 31, 2016***

BOULDER, Colo.--(BUSINESS WIRE)--November 5, 2015--Clovis Oncology, Inc. (NASDAQ:CLVS) reported financial results for its quarter ended September 30, 2015, and provided an update on the Company's clinical development programs for 2015.

"We are entering a new phase at Clovis, transitioning into becoming a commercial biopharmaceutical company," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "Our U.S. commercial organization, including the sales force, is now fully in place. This team is highly experienced, enthusiastic and ready to go, following our U.S. launch meeting last week. We are now fully prepared to launch rociletinib upon a potential U.S. approval and we are actively building our E.U. commercial organization in preparation for a late 2016 launch in Europe. Additionally, having advanced our rucaparib NDA submission timeline to Q2 2016, we are planning for a potential U.S. launch of rucaparib for advanced ovarian cancer by the end of 2016. We are very enthusiastic about the prospect of having our commercial organization support sales for both rociletinib and rucaparib."

**Third Quarter 2015 Financial Results**

Net loss attributable to common shareholders was $98.6 million ($2.62 per share) for the third quarter of 2015 and $233.3 million ($6.62 per share) for the first nine months of 2015, compared to a net loss of $39.6 million ($1.17 per share) and $105.1 million ($3.10 per share) for the comparable periods of 2014.

Research and development expenses totaled $76.1 million for the third quarter of 2015 and $193.3 million for the first nine months of 2015, compared to $35.0 million and $87.6 million for the comparable periods in 2014. The increase in

expenses for both the three- and nine-month periods is due to the significantly expanded clinical development activities for rociletinib and rucaparib, increased launch planning activities for rociletinib and increased personnel-related expenses associated with the hiring of additional staff to support the Company's expanded activities.

General and administrative expenses totaled $8.3 million for the third quarter of 2015 and $22.3 million for the first nine months of 2015, compared to $5.3 million and $15.9 million for the comparable periods in 2014. The year over year increase is primarily due to higher share-based compensation and personnel expense for employees engaged in general and administrative activities, increased facility costs and higher professional service fees.

Acquired in-process research and development expenses totaled $12.0 million for both the third quarter of 2015 and the first nine months of 2015. There was no acquired in-process research and development expense for the third quarter of 2014 and $8.8 million for the first nine months of 2014. During the third quarter of 2015, the Company made milestone payments totaling $12.0 million to Celgene Corporation upon acceptance of the NDA and MAA submissions for rociletinib by the FDA and EMA, respectively.

Share-based compensation expense totaled $12.4 million for the third quarter of 2015 and $29.5 million for the first nine months of 2015.

Clovis had $605.9 million in cash, cash equivalents and available-for-sale securities and approximately 38.3 million outstanding shares of common stock as of September 30, 2015. Our net cash used in operations for the third quarter of 2015 was $71.7 million and $177.4 million for the first nine months of 2015, including $12.0 million in rociletinib milestone payments. In July 2015, the Company raised net proceeds of $298.5 million through an offering of 4.1 million shares of common stock.

**2015 Key Milestones and Objectives**

Highlights of planned or completed objectives for each product follows:

Rociletinib

Rociletinib is an investigational therapy for the treatment of patients with mutant epidermal growth factor receptor (EGFR) non-small cell lung cancer (NSCLC) who have been previously treated with an EGFR-targeted therapy and have the EGFR T790M mutation. The U.S. Food and Drug Administration (FDA) has accepted Clovis' New Drug Application (NDA) for rociletinib and has granted it priority review status with a Prescription Drug User Fee Act (PDUFA) action date of March

30, 2016. In addition, the European Medicines Agency (EMA) has accepted the Marketing Authorization Application (MAA) for rociletinib.

The U.S. commercial and medical affairs organizations are now in place and efforts are currently underway to build out the E.U. commercial organization.

Rociletinib was the subject of several posters and presentations during the third quarter, including updates of data from the TIGER-X study in EGFR mutant, T790M-positive patients with a history of CNS involvement, as well as EGFR mutant, T790M-negative patients as determined by tissue as well as plasma testing.

51.     On August 7, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2015.  The Company's Form 10-Q was signed by Defendant Mahafy and reaffirmed the Company's financial results previously announced on November 5, 2015.

## THE TRUTH IS DISCLOSED

52.     On November 16, 2015, Defendants caused the Company to issue a press release disclosing that the FDA requested additional clinical data after the efficacy of rociletinib was questioned.  The press release stated in relevant part:

- *Mid-Cycle Communication Meeting with FDA completed*

- *Additional clinical information for 500mg and 625mg BID dose groups to be provided by the Company today*

  **BOULDER, Colo., November 16, 2015** – Clovis Oncology, Inc. (NASDAQ: CLVS) today announced that during its regularly scheduled Mid-Cycle Communication Meeting held last week with the U.S. Food and Drug Administration (FDA), the agency requested additional clinical data for use in the efficacy analysis for both the 500mg and 625mg BID dose patient groups for rociletinib. The Company will provide this information in a Major Amendment to the FDA by close of business today.

  "We remain confident in rociletinib and its potential to treat patients with mutant EGFR T790M-positive lung cancer, said Patrick J. Mahaffy, President and CEO

of Clovis Oncology. "We will continue to work diligently with the FDA on our NDA submission."

In the Mid-Cycle Communication meeting, the FDA emphasized that its efficacy analysis would focus solely on confirmed responses. The New Drug Application (NDA) submitted by Clovis to the FDA contained immature data sets based on both unconfirmed response rates and confirmed response rates. These data sets were updated in the 90 day efficacy update the Company submitted at the end of October.

As the rociletinib clinical trials were rapidly enrolling, Clovis presented interim data publicly and at medical meetings and these data therefore included a data set based primarily on unconfirmed responses. This was also true of the Company's Breakthrough Therapy designation submission. In the Company's NDA submission, both immature confirmed and unconfirmed response analyses were submitted. As the efficacy data have matured, the number of patients with an unconfirmed response who converted to a confirmed response was lower than expected.

In the intent to treat analysis of the 79 patients in the 500mg dose group, the current confirmed response rate is 28 percent, and 34 percent in the 170 patients in the 625mg dose group, with an encouraging duration of response in both doses. The most frequent reasons that patients' responses were not confirmed in a subsequent scan were due to progression, often due to brain metastasis, and due to subsequent scans not demonstrating tumor shrinkage greater than 30 percent.

The Company anticipates that the review of this additional information will result in a delay of a potential approval. This additional review could lead to an extension of the Company's March 30, 2016 Prescription Drug User Fee Act (PDUFA) date.

53.     This news caused the Company's stock to plummet, closing at $30.34 on November 16, 2015, more than a 70% decline.

54.     On January 25, 3016, the Company replaced its key executive, Steven Hoerter, who led the Company's drug commercialization efforts since 2011.

**DAMAGES TO CLOVIS**

55.     As a direct and proximate result of the Individual Defendants' actions, Clovis has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to, the following:

        a.      costs incurred from defending and paying any settlement or judgment in securities fraud class actions brought by current and former Clovis shareholders; and

        b.      costs incurred from compensation and benefits paid to the defendants who have breached their duties to the Company.

56.     Moreover, the actions taken by the Individual Defendants have irreparably damaged Clovis' corporate image and goodwill.

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

57.     Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, as well as the aiding and abetting thereof, by the Individual Defendants. The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

58.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

59.     Plaintiff is an owner of the Company's common stock and was the owner of the Company's common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

60.     At the time that Plaintiff originally commenced this action, the Company's Board consisted of the following directors: Defendants Atwood, Barrett, Blair, Flaherty, Graham, Klingenstein, Mahaffy, McKinley and Spickschen (the "Director Defendants").

61.     Because of the facts set forth herein, Plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.     Specific details of the Company's drug, rociletinib, or CO-1686, that ultimately determined the future viability and profitability of the entire Company would undoubtedly have been shared at the Company's Board meetings and discussed at length. Thus, all Defendants, because of their positions, backgrounds, and educations, had considerable knowledge concerning the status of the Company's clinical data.

b.     At the time this action was initiated, the principal profession of Defendant Mahaffy was his employment with Clovis as its CEO and President, pursuant to which he received substantial monetary compensation and other benefits.  In 2014, Defendant Mahaffy was awarded over $10 million in compensation.   Accordingly, reasonable doubt exist that defendant Mahaffy can be disinterested and independent in evaluating Plaintiff's demand.

c.     The Audit Committee, Defendants Atwood, Klingenstein and McKinley, breached their fiduciary duties by failing to perform their designated duties and responsibilities as delineated in the Audit Committee Charter by causing and allowing the Company to issue false and misleading statements; failing to identify, detect and prevent material misstatements in the Company's financial statements; and failing to put in place or maintain proper internal controls.

38

As a result of their breaches of duties of care, good faith, and loyalty, the Audit Committee Defendants face a substantial likelihood of liability such that any demand upon them is futile.

d.      During the Relevant Period, Defendants Barrett, Blair, Spickschen and Graham served as members of the Compensation Committee.  Consequently, these Defendants breached their fiduciary duties of due care, loyalty, and good faith when they caused or permitted the Company to make compensation decisions that were entirely based on fictitious results fueled by Defendants' misleading statements.  The Compensation Committee allowed Defendant Mahaffy to reap over $10 million in compensation in 2014 despite the fact the Company has never earned a profit and has incurred losses each year since its inception in April 2009.   This Board decision is not a protected business judgment.  Therefore, these Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile

e.      Each Individual Defendant had a duty to diligently evaluate information provided to the Board by management and to ensure that reasonable systems of reporting existed such that all relevant information. It was the duty of the Individual Defendants to properly evaluate this information and provide thorough guidance and governance to the Company. The Individual Defendants failed in these duties. The Individual Defendants either evaluated this information and rubber-stamped Clovis' misrepresentations or failed to ensure information necessary to prevent the misrepresentations was provided to them.

f.      Director Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

g.     The entire Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, the Company's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced Defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws;

h.     Director Defendants signed certain of the Company's SEC filings. Accordingly, demand is futile because of the substantial likelihood of liability for breach of fiduciary duties owed to the Company through the signing of the Company's misleading SEC filings;

i.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

j.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

k.     In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

40

l.      The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification;

m.      Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

n.      Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves; and

o.      The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby.

62.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by Plaintiff herein.

63.     The conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected

41

the Company to substantial damages. Through their intentional misconduct, the Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

**COUNT I**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION)**

64.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

65.     The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws. The Individual Defendants, however, breached their fiduciary duties by allowing the Company to issue and disseminate misleading statements and filings.

66.     As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing. The alleged acts of wrongdoing have subjected the Company to unreasonable risks of losses and expenses.

67.     Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid

exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company. As a result of the Individual Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY)

68.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

69.     The Individual Defendants owed the Company fiduciary obligations. By reason of such fiduciary obligations, the Individual Defendants specifically owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care, reasonable inquiry, oversight, and supervision.

70.      The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision by engaging in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules, and regulations. As a direct and proximate result of the Individual Defendants' failure to adequately perform their fiduciary obligations, the Company has sustained significant damages monetarily and injury to its corporate image and goodwill.

71.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff, moreover, has no adequate remedy at law.

## COUNT III
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT)

72.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

73.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial disclosures of the Company.  The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

74.     During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, the Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

### COUNT V
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

75.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

76.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

77.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 18, 2016                    Respectfully submitted,


/s/ William B. Federman
William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, Oklahoma 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
Email: wbf@federmanlaw.com

*Attorney for Plaintiff Maris Sanchez*

## VERIFICATION

I, Maris Sanchez, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Clovis Oncology, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder of Clovis Oncology, Inc., during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

2-4-16
Date

MARIS SANCHEZ